# In The
# United States Court of Appeals
## For The Ninth Circuit

### MARIA HERNANDEZ,
### on behalf of herself and all others similarly situated,

*Plaintiff – Appellant,*

**v.**

### WILLIAMS, ZINMAN & PARHAM PC,

*Defendant – Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR ARIZONA, PHOENIX

───────

## REPLY BRIEF OF APPELLANT

───────

**Aaron D. Radbil**
**GREENWALD DAVIDSON RADBIL PLLC**
**5550 Glades Road, Suite 500**
**Boca Raton, Florida 33431**
**(561) 826-5477**

*Counsel for Appellant*

## Table of Contents

**Page**

Table of Authorities ................................................................ iii

Introduction ........................................................................1

Argument............................................................................1

I.    A natural reading of Subsection 1692g(a) cuts directly against WZP's suggested interpretation ...........................................1

II.    But assuming, for the sake of argument, that there are two plausible interpretations of Subsection 1692g(a), WZP's suggested interpretation fails as it undermines the purpose of the provision itself ................................................................3

    A.    WZP acknowledges that its suggested interpretation creates a loophole in the FDCPA, which allows debt collectors to make an end-run around Subsection 1692g(a) ...................................................................5

    B.    WZP overlooks that its suggested interpretation strips consumers of the very protection that Congress intended to afford them by way of Subsection 1692g(a)..........................7

    C.    WZP's suggested interpretation turns a blind eye to the reality of the debt collection industry ......................................12

III.    That the FDCPA is a remedial statute, to be interpreted liberally in favor of consumers, undercuts WZP's suggested interpretation ......................................................................15

IV.    The Circuit Courts of Appeals that issued *Lee v. Cohen, McNeile & Pappas, P.C.*, and *Oppong v. First Union Mortgage Corp.* specifically noted that the decisions are unpublished, not binding, and lack precedential value ..................................16

V.     WZP's citation to district court opinions that ignore not only the natural reading of Subsection 1692g(a), but also the purpose for which Congress drafted the provision, carry little weight.............17

Conclusion ........................................................................................................17

Certificate of Compliance

Certificate of Filing and Service

## Table of Authorities

**Page(s)**

**Cases**

*Amalgamated Transit Union Local 1309, AFL-CIO v.*
*Laidlaw Transit Servs., Inc.*,
  448 F.3d 1092 (9th Cir. 2006) ...................................................................3, 4

*Bailey v. Security Nat'l Servicing Corp.*,
  154 F.3d 384 (7th Cir. 1998) ........................................................................13

*Boys Markets, Inc. v. Retail Clerks Union, Local 770*,
  398 U.S. 235 (1970) ........................................................................................2

*Donovan v. S. California Gas Co.*,
  715 F.2d 1405 (9th Cir. 1983) .......................................................................4

*Evon v. Law Offices of Sidney Mickell*,
  688 F.3d 1015 (9th Cir. 2012) ......................................................................15

*Gen. Dynamics Land Sys., Inc. v. Cline*,
  540 U.S. 581 (2004) ........................................................................................1

*Gonzales v. Arrow Fin. Servs., LLC*,
  660 F.3d 1055 (9th Cir. 2011) ......................................................................15

*Heppner v. Alyeska Pipeline Serv. Co.*,
  665 F.2d 868 (9th Cir. 1981) .........................................................................4

*Hernandez v. Midland Credit Mgmt., Inc.*,
  No. 04 C 7844, 2007 WL 2874059 (N.D. Ill. Sept. 25, 2007) .....................13

*Hibbs v. Winn*,
  542 U.S. 88 (2004) ..........................................................................................6

*INS v. Cardoza–Fonseca*,
  480 U.S. 421 (1987) ........................................................................................3

*John v. United States*,
    247 F.3d 1032 (9th Cir. 2001) ....................................................................2

*Lee v. Cohen, McNeile & Pappas, P.C., et al.*,
    No. 12-3188 (10th Cir. 2013) ..................................................................16

*Lindahl v. Office of Pers. Mgmt.*,
    470 U.S. 768 (1985)....................................................................................2

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007)....................................................................................1

*Oppong v. First Union Mortgage Corp.*,
    566 F. Supp. 2d 395 (E.D. Pa. 2008)........................................................16

*Overcash v. United Abstract Grp., Inc.*,
    549 F. Supp. 2d 193 (N.D.N.Y. 2008) ......................................................11

*Schlosser v. Fairbanks Capital Corp.*,
    323 F.3d 534 (7th Cir. 2003) ....................................................................13

*Swanson v. Southern Oregon Credit Serv., Inc.*,
    869 F.2d 1222 (9th Cir. 1988) ..............................................................8, 15

*Thomas v. Law Firm of Simpson & Cybak*,
    392 F.3d 914 (7th Cir. 2004) ......................................................................6

*Turner v. Shenandoah Legal Grp., P.C.*,
    No. 3:06CV045, 2006 WL 1685698 (E.D. Va. June 12, 2006) ....................5

*United States v. Am. Trucking Ass'ns*,
    310 U.S. 534 (1940)................................................................................2, 3

*United States v. Asset Acceptance, LLC*,
    No. 8:12-cv-00182-T-27EAJ (M.D. Fla. Jan. 30, 2012) ..............................11

*United States v. Wells*,
    519 U.S. 482 (1997)....................................................................................1

**Statute**

15 U.S.C. § 1692g(a) .........................................................................*passim*

**Other Authorities**

BD. OF GOVERNORS OF THE FED. RESERVE SYS., CONSUMER CREDIT—G.19, CURRENT RELEASE—DEC. 2014, *available at* http://www.federalreserve.gov/releases/g19/current/ ...............................................12

BD. OF GOVERNORS OF THE FED. RESERVE SYS., HISTORICAL DATA FOR CONSUMER CREDIT OUTSTANDING (LEVELS), *available at* http://www.federalreserve.gov/releases/g19/HIST/cc_hist_mh_levels.html ..........12

Caroline E. Mayer, *As Debt Collectors Multiply, So Do Consumer Complaints*, WASH. POST, July 28, 2005, *available at* http://www.washingtonpost.com/wp-dyn/content/article/ 2005/07/27/AR2005072702473.html ................................................................ 12-13

FED. TRADE COMM'N, COLLECTING CONSUMER DEBTS: THE CHALLENGES OF CHANGE, A WORKSHOP REPORT 13 (2009), *available at* http://www.ftc.gov/sites/default/files/documents/reports/collecting-consumer-debts-challenges-change-federal-trade-commission-workshop-report/dcwr.pdf.........................................................................................12

FED. TRADE COMM'N, CONSUMER SENTINEL NETWORK DATA BOOK FOR JAN.–DEC. 2012 5-6 (2013), *available at* http://www.ftc.gov/sentinel/reports/sentinel-annualreports/sentinel-cy2012.pdf.................................................................................................11

FED. TRADE COMM'N, THE STRUCTURE AND PRACTICES OF THE DEBT BUYING INDUS. 34-35 (2013), *available at* http://www.ftc.gov/sites/default/files/documents/reports/ structure-and-practices-debt-buying-industry/debtbuyingreport.pdf............................................14

H.R. REP. NO. 95–131, at 8 (1977), as *reprinted in* 1977 U.S.S.C.A.N...................8

Julie Brill, Comm'r, Fed. Trade Comm'n, Opening Remarks at the Life of Debt: Data Integrity in Debt Collection FTC Roundtable (Jun. 6, 2013), *available at* http://www.ftc.gov/sites/default/files/documents/public_statements/life-debt-data-integrity-debt-collection/130606debtcollectionroundtable.pdf ........................................................15

Kathy M. Kristof, *When Debt Collectors Go After the Wrong Person*, L.A. TIMES, Dec. 19, 2010, *available at* http://articles.latimes.com/2010/dec/19/business/la-fi-perfin-20101219 ................14

Mary Spector, *Litigating Consumer Debt Collection: A Study*, 31 No. 6 BANKING & FIN. SERVS. POL'Y REPORT 1, 2 (2012) .................................................12

Presidential Statement on Signing the Consumer Protection Act Amendments 1977, 2 PUB. PAPERS 1628 (Sept. 20, 1977).......................................10

Press Release, Fed. Trade Comm'n, World's Largest Debt Collection Operation Settles FTC Charges, Will Pay $3.2 Million Penalty (July 9, 2013), *available at* http://www.ftc.gov/opa/2013/07/nco.shtm..............................11

Rick Jurgens & Robert J. Hobbs, *The Debt Machine, How the Collection Industry Hounds Consumers and Overwhelms Courts*, NAT'L CONSUMER LAW CTR., 5 (July 2010), *available at* http://www.nclc.org/images/pdf/pr-reports/debt-machine.pdf .......................................................................................13

Roscoe Pound, *Spurious Interpretation*, 7. Colum. L. Rev. 379, 381 (1907)..........4

S. REP. 95-382, 4, *reprinted in* 1977 U.S.C.C.A.N. 1695, 1699) ..............................8

*The Debt Collection Practices Act: Hearings on H.R. 11969 Before the H. Subcomm. on Consumer Affairs of the H. Comm. On Banking, Currency & Hous.*, 94th Cong. 63–66 (1976)..............................................................................9

*The Debt Collection Practices Act: Hearings on H.R. 11969 Before the H. Subcomm. on Consumer Affairs of the H. Comm. On Banking, Currency & Hous.*, 94th Cong. 29-30 (1976) .......................................................................9, 10

*The Debt Collection Practices Act: Hearings on H.R. 29 Before the H. Subcomm. on Consumer Affairs of the H. Comm. on Banking, Fin. & Urban Affairs*, 95th Cong. 27 (1977) ................................................................................9

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-09-748, CREDIT CARDS: FAIR DEBT COLLECTION PRACTICES ACT COULD BETTER REFLECT THE EVOLVING DEBT COLLECTION MARKETPLACE AND USE OF TECHNOLOGY 7 (2009), *available at* http://www.gao.gov/new.items/d09748.pdf ........................................13

**Introduction**

WZP suggests that this Court should adopt an interpretation of Subsection 1692g(a) that is contrary to the natural reading of the provision, that undermines the very purpose for which Congress enacted it, and that requires this Court to ignore the FDCPA's broad, remedial nature.

In doing so, WZP relies on district court opinions that simply cannot withstand a reasoned review, as well as two unpublished decisions that the issuing circuit courts deemed not binding, and without precedential value, and which, in any event, do not stand for the exact propositions that WZP contends they do.

This Court should therefore reject WZP's suggested interpretation, in favor of the interpretation that Ms. Hernandez sets forth—an interpretation with which both the FTC and CFPB agree.

**Argument**

**I.     A natural reading of Subsection 1692g(a) cuts directly against WZP's suggested interpretation.**

The "first criterion in the statutory interpretation hierarchy" is "a natural reading of the full text." *United States v. Wells*, 519 U.S. 482, 483 (1997); *see, e.g., Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 679 (2007) (approving "the most natural reading of the text"); *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 586 (2004) (adopting "the natural reading of the whole provision").

Accordingly, "[s]tatutory interpretation requires more than concentration upon isolated words[.]" *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 250 (1970); *see also Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 786 n. 22 (1985) (rejecting the use of "a patchwork of isolated phrases wrenched out of context"); *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940) ("To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute[.]"); *John v. United States*, 247 F.3d 1032, 1041 (9th Cir. 2001) (rejecting the use of an "isolated word, phrase, or even section of a statute," to determine its meaning).

The provision now at issue, Subsection 1692g(a), reads:

> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

15 U.S.C. § 1692g(a).

WZP suggests that because this provision references "the initial communication" there can be "only one initial communication." DktEntry 30 at 20. In other words, WZP argues that the meaning of Subsection 1692g(a) can be determined by focusing on a few isolated words, absent context.

2

But the natural reading of Subsection 1692g(a) does not limit its reach only to the first debt collector that attempts to collect a particular debt. Rather, the natural reading of the provision dictates that a debt collector must send a notice to the consumer with whom it initially communicates, within a specified period of time.

**II. But assuming, for the sake of argument, that there are two plausible interpretations of Subsection 1692g(a), WZP's suggested interpretation fails as it undermines the purpose of the provision itself.**

"In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress." *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940); *see also Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc.*, 448 F.3d 1092, 1093 (9th Cir. 2006) ("[W]hen we interpret a statute, our purpose is always to discern the intent of Congress.") (internal quotation omitted).

And while "there is a strong presumption that Congress has expressed its intent in the language it chose," *see id.* (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12 (1987), the plain meaning rule "does not require a court to operate under an artificially induced sense of amnesia about the purpose of legislation, or to turn a blind eye towards significant evidence of Congressional intent in the

3

legislative history." *Id.* (quoting *Heppner v. Alyeska Pipeline Serv. Co.*, 665 F.2d 868, 871 (9th Cir. 1981)).[1]

This is because "the object of genuine interpretation is to discover the rule which the law-maker intended to establish," and to "derive from the language the same idea which the author intended to convey." Roscoe Pound, *Spurious Interpretation*, 7. Colum. L. Rev. 379, 381 (1907).

Here, WZP's suggested interpretation creates a loophole in the FDCPA, which allows debt collectors to make an end-run around Subsection 1692g(a). It also undermines the purpose of the provision, and exacerbates the very problems that Congress drafted it to remedy. What's more, WZP's reading of Subsection 1692g(a)—which renders it inapplicable to a group of debt collectors who, according to the FTC, often attempt to collect debts based on insufficient and inaccurate information—ignores the reality of the debt collection business.

Significantly, this Court has made clear that it will not "allow the construction of a statute [that] undermines the purpose of Congress in enacting the statute." *Donovan v. S. California Gas Co.*, 715 F.2d 1405, 1408 (9th Cir. 1983).

---

[1]     To be clear, Ms. Hernandez does not suggest that this Court adopt an interpretation contrary to the plain meaning of the provision at issue. Quite contrary, Ms. Hernandez suggests that her interpretation—one with which both the FTC and CFPB agree—is not only the result of a natural reading of Subsection 1692g(a), but also consistent with Congress's intent.

**A.  WZP acknowledges that its suggested interpretation creates a loophole in the FDCPA, which allows debt collectors to make an end-run around Subsection 1692g(a).**

WZP acknowledges that its suggested interpretation could lead to the circumstance in which a subsequent debt collector would be free to collect an alleged debt, without ever having to comply with Subsection 1692g(a), despite that the original debt collector chose not to validate the consumer's debt in the face of the consumer's request for validation, but rather passed the consumer's debt along to a subsequent debt collector so as to avoid having to comply with Subsection 1692g(a). *See* DktEntry 30 at 33-36. In other words, WZP recognizes that to not require subsequent debt collectors to comply with Subsection 1692g(a) "would create a loophole, an end-run around the validation notice requirement . . . [that is] inconsistent with the drafter's intention . . . ." *Turner v. Shenandoah Legal Grp., P.C.*, No. 3:06CV045, 2006 WL 1685698, at *11 (E.D. Va. June 12, 2006) (internal quotation marks omitted).[2]

---

[2]  Worth mentioning, the Seventh Circuit previously expressed its concern with a similar loophole:

> Furthermore, to except the service of pleadings from the definition of "communication" would erode the § 1692g requirement to inform debtors of their validation rights; debt collectors could avoid their obligation to advise debtors of their validation rights altogether by initiating litigation. Such a loophole, creating an end-run around the validation notice requirement, is inconsistent with the drafters' intention of protecting debtors from "unfair, harassing, and deceptive"

WZP contends, nonetheless, that "this concern does not warrant" Ms. Hernandez's "worries" because "other provisions of the FDCPA would provide ample protection to the consumer under these facts." DktEntry 30 at 34. But notwithstanding that WZP fails to detail how other sections of the FDCPA provide consumers with the same protection that Subsection 1692g(a) affords, WZP's argument is akin to a suggestion that Subsection 1692g(a) is without any effect of its own. It therefore fails given that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

WZP additionally argues that Ms. Hernandez's "concern" does not warrant this Court's consideration because if faced with a debt collector's attempt to make an end-run around the validation notice requirement "a court would likely hold that a subsequent debt collector, in privity with a previous debt collector (as in the instant case), must respect any dispute received by the previous debt collector and cannot continue with collection efforts." DktEntry 30 at 35.[3] WZP's contention is

---

collection tactics, especially because many debtors cannot afford to hire attorneys to represent them in collection actions.

*Thomas v. Law Firm of Simpson & Cybak*, 392 F.3d 914, 918 (7th Cir. 2004).

[3]    Naturally, WZP's contention is unworkable in the context of a subsequent debt collector not in privity with a previous debt collector, as the subsequent debt collector would be (quite unfairly) held accountable for previous debt collection conduct about which it was necessarily unaware.

belied, however, not only by the fact that the district court in this matter did not hold as much, but also by the fact that WZP points to no court that has held as much.

WZP's contention also ignores that subsequent debt collectors not in privity with the initial debt collector would remain free to take advantage of the loophole that WZP's suggested interpretation creates. So at the end of the day, even if courts were to uniformly adopt WZP's suggested course of action—Ms. Hernandez's counsel is unaware of any court that has—the ability to make an end-run around Subsection 1692g(a) that results from WZP's reading of the provision remains.

### B. WZP overlooks that its suggested interpretation strips consumers of the very protection that Congress intended to afford them by way of Subsection 1692g(a).

WZP discounts, almost entirely, that its suggested interpretation necessarily precludes a consumer from using Subsection 1692g(a) to request that a subsequent debt collector validate an alleged debt—even where the consumer contests the alleged debt as paid, or discharged in bankruptcy, or the result of mistaken information, or the result of identity theft, or beyond the statute of limitations. In doing so, WZP ignores that "Congress designed the [FDCPA] to 'eliminate the recurring problem of debt collectors dunning the wrong person or attempting to

collect debts which the consumer has already paid.'" *Swanson*, 869 F.2d at 1225 (citing S. REP. 95-382, 4, *reprinted in* 1977 U.S.C.C.A.N. 1695, 1699).[4]

WZP also overlooks that its reading of Subsection 1692g(a) compounds the very problems that Congress drafted the FDCPA to remedy. For example, prior to enacting the FDCPA Congress heard testimony and received letters from consumers who alleged that debt collectors harassed them in an effort to collect debts that they did not owe. *See* H.R. REP. NO. 95–131, at 8 (1977), as *reprinted in* 1977 U.S.S.C.A.N. (stating "of the thousands of letters received by the committee

---

[4]    The Senate Report reads, in relevant part:

> Another significant feature of this legislation is its provision requiring the validation of debts. After initially contacting a consumer, a debt collector must sen[d] him or her written notice stating the name of the creditor and the amount owed. If the consumer disputes the validity of the debt within 30 days, the debt collector must cease collection until he sends the consumer verification.

> This provision will eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid. Since the current practice of most debt collectors is to send similar information to consumers, this provision will not result in additional expense or paperwork.

Tellingly, nothing about this language suggests that Congress intended to limit Subsection 1692g(a)'s applicability only to the first debt collector to attempt to collect a particular debt.

concerning debt collection problems, most . . . were from individuals who did not owe the debt in the first place or from people who were making legitimate attempts to repay the money"); *The Debt Collection Practices Act: Hearings on H.R. 11969 Before the H. Subcomm. on Consumer Affairs of the H. Comm. On Banking, Currency & Hous.*, 94th Cong. 63–66 (1976) (consumer testifying about a debt collector's attempts to recover an alleged debt for a newspaper subscription that the consumer never had); *Id.* at 71 (Carolyn Fox testifying about attempts to collect from her the debt of Claire E. Fox).

Congress also heard testimony from debt collectors who stated that they often attempted to collect debts without knowing whether they were valid. *See The Debt Collection Practices Act: Hearings on H.R. 29 Before the H. Subcomm. on Consumer Affairs of the H. Comm. on Banking, Fin. & Urban Affairs*, 95th Cong. 27 (1977) (testimony from a former debt collector stating: "The debt collectors feel that their job is not to find out if the money is owed but rather to collect the money. . . . [A] debt collector who takes time to figure out if debts are owed instead of just collecting them will soon be unemployed."); *The Debt Collection Practices Act: Hearings on H.R. 11969 Before the H. Subcomm. on Consumer Affairs of the H. Comm. On Banking, Currency & Hous.*, 94th Cong. 29-30 (1976) (testimony of a

former debt collector acknowledging that "at least 50 percent" of the record and book account debts that he was hired to collect "were not legitimate" debts); *Id.* at 46 (describing the debt collector's technique of embarrassing a consumer so he would pay even if the debt was not owed and stating that one debt collector had proudly posted a letter over his desk that stated: "I don't owe this bill, but I am sending you the money just to be rid of you.").

And President Carter, through his signing statement for the FDCPA, recognized the problem of debt collectors trying to recover from alleged debtors who did not owe debts. *See* Presidential Statement on Signing the Consumer Protection Act Amendments 1977, 2 PUB. PAPERS 1628 (Sept. 20, 1977) (stating "[t]estimony . . . was given during the hearings on the bill showed that quite often innocent consumers—some of whom had been misidentified as debtors—were harassed").

Of course, stripping consumers of the ability to request that subsequent debt collectors validate alleged debts before continuing with their efforts to collect the debts—especially in the face of statements from consumers like: "I don't owe that

debt,"[5] "I never joined Bally Total Fitness,"[6] "I was the victim of identity theft,"[7] or "I already paid that debt"[8]—serves only to ensure that the problems Congress considered in enacting the FDCPA remain entrenched in the debt collection industry.

---

[5] *See* Press Release, Fed. Trade Comm'n, World's Largest Debt Collection Operation Settles FTC Charges, Will Pay $3.2 Million Penalty (July 9, 2013) (Expert Global Solutions and its subsidiaries, who represent the world's largest debt-collection operation, agreed to settle FTC claims that included allegations that debt collectors continued to call consumers even after consumers denied owing debts), *available at* http://www.ftc.gov/opa/2013/07/nco.shtm

[6] *See United States v. Asset Acceptance, LLC*, No. 8:12-cv-00182-T-27EAJ (M.D. Fla. Jan. 30, 2012) (Asset Acceptance, a debt purchaser and collector, knew that the portfolio of debts it acquired from Bally Total Fitness contained unreliable data, including inaccurate or missing Social Security numbers, but tried, nonetheless, to collect alleged debts from individuals who did not have any agreement with Bally Total Fitness), *available at* http://www.ftc.gov/opa/2012/01/asset.shtm

[7] In 2012 consumers filed 370,000 identity theft claims. *See* Fed. Trade Comm'n, Consumer Sentinel Network Data Book For Jan.–Dec. 2012 5-6 (2013), *available at* http://www.ftc.gov/sentinel/reports/sentinel-annualreports/sentinel-cy2012.pdf

[8] *Overcash v. United Abstract Grp., Inc.*, 549 F. Supp. 2d 193 (N.D.N.Y. 2008) (Chase Bank sold Larry Overcash's credit-card debt of $1,353.15 to United Abstract, who in turn sent a letter to Overcash noting that the debt was paid in full. Despite this correspondence, the debt was subsequently sold and resold. American Credit, the ultimate purchaser of the account, sought to collect $41,701.58 from Overcash, and reported this amount to the credit bureaus.).

**C.** **WZP's suggested interpretation turns a blind eye to the reality of the debt collection industry.**

According to the Federal Reserve, consumer debt in the United States rose from about $350 billion in 1980, s*ee* BD. OF GOVERNORS OF THE FED. RESERVE SYS., HISTORICAL DATA FOR CONSUMER CREDIT OUTSTANDING (LEVELS),[9] to over $3 trillion in 2013. *See* BD. OF GOVERNORS OF THE FED. RESERVE SYS., CONSUMER CREDIT—G.19, CURRENT RELEASE—DEC. 2014.[10] Growth in the debt-collection industry mirrored this dramatic increase. *See* Mary Spector, *Litigating Consumer Debt Collection: A Study*, 31 No. 6 BANKING & FIN. SERVS. POL'Y REPORT 1, 2 (2012). And the development of the debt-buying industry followed. *See* FED. TRADE COMM'N, COLLECTING CONSUMER DEBTS: THE CHALLENGES OF CHANGE, A WORKSHOP REPORT 13 (2009).[11]

In 1996, only about a dozen debt-buying firms existed. *See* Caroline E. Mayer, *As Debt Collectors Multiply, So Do Consumer Complaints*, WASH. POST,

---

[9]     *Available at* http://www.federalreserve.gov/releases/g19/HIST/cc_hist_mh_levels.html

[10]     *Available at* http://www.federalreserve.gov/releases/g19/current/

[11]     *Available at* http://www.ftc.gov/sites/default/files/documents/reports/collecting-consumer-debts-challenges-change-federal-trade-commission-workshop-report/dcwr.pdf

July 28, 2005.[12] Today, more than 500 operate. *See id*. And from 1993 to 2005 the amount of purchased debt rose nearly twenty-fold, from $6 billion to over $110 billion. *See* Rick Jurgens & Robert J. Hobbs, *The Debt Machine, How the Collection Industry Hounds Consumers and Overwhelms Courts*, NAT'L CONSUMER LAW CTR., 5 (July 2010).[13]

Significant to the issue now before this Court, as much as fifty percent of purchased debt is resold. U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-09-748, CREDIT CARDS: FAIR DEBT COLLECTION PRACTICES ACT COULD BETTER REFLECT THE EVOLVING DEBT COLLECTION MARKETPLACE AND USE OF TECHNOLOGY 7 (2009).[14] This means that about half of debt buyers—who are debt collectors under the FDCPA, *see Bailey v. Security Nat'l Servicing Corp.*, 154 F.3d 384, 387-88 (7th Cir. 1998); *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003); *Hernandez v. Midland Credit Mgmt., Inc.*, No. 04 C 7844, 2007 WL 2874059, at *17 (N.D. Ill. Sept. 25, 2007)—are subsequent debt collectors.

It follows that pursuant to WZP's suggested interpretation, consumers alleged to owe debt buyers over $55 billion in resold debt would be unable to use Subsection 1692g(a) to request that a debt buyer attempting to collect a resold debt

---

[12] *Available at* http://www.washingtonpost.com/wp-dyn/content/article/ 2005/07/27/AR2005072702473.html

[13] *Available at* http://www.nclc.org/images/pdf/pr-reports/debt-machine.pdf

[14] *Available at* http://www.gao.gov/new.items/d09748.pdf

validate the alleged debt. And if this simple figure is not reason enough to reject WZP's suggested interpretation, the manner in which debt sales occur certainly is.

This is because as part of a debt sale, a debt buyer typically receives only summary data on the debts that it purchases. FED. TRADE COMM'N, THE STRUCTURE AND PRACTICES OF THE DEBT BUYING INDUS. 34-35 (2013).[15] Moreover, sellers usually do not include in the data files they provide to debt buyers information about the specifics of the collection history of the individual debts in their portfolios. *Id*. at 36. Consequently, debt buyers usually do not receive dispute-history information at the time of sale. *Id*. at 37. And this is all against the backdrop of the circumstance that debt buyers often purchase debts on an "as-is and with all faults" basis, without representations regarding the enforceability of the debts or the accuracy of the information transferred. *Id.* at 36.

This lack of information, coupled with sellers' typical disclaimers about the validity of the debts they sell, therefore highlights the importance of a consumer's right to request that a debt buyer validate an alleged debt that it attempts to collect. And that debt buyers often resell debts several times, *see* Kathy M. Kristof, *When Debt Collectors Go After the Wrong Person*, L.A. TIMES, Dec. 19, 2010,[16] makes

---

[15]     *Available at* http://www.ftc.gov/sites/default/files/documents/reports/ structure-and-practices-debt-buying-industry/debtbuyingreport.pdf

[16]     *Available at* http://articles.latimes.com/2010/dec/19/business/la-fi-perfin-20101219

Subsection 1692g(a)'s application to subsequent debt collectors all the more important.

So in light of Congress's intent to remedy, by way of the FDCPA, the "recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid," *Swanson*, 869 F.2d at 1225, it seems quite inappropriate to construe Subsection 1692g(a) in a manner that renders it inapplicable to debt collectors who FTC Commissioner Julie Brill openly recognized "may have insufficient or inaccurate information when they collect on debts, which may result in [their efforts] to recover from the wrong consumer or recover the wrong amount." Julie Brill, Comm'r, Fed. Trade Comm'n, Opening Remarks at the Life of Debt: Data Integrity in Debt Collection FTC Roundtable (Jun. 6, 2013) (discussing debt buyers).[17]

### III. That the FDCPA is a remedial statute, to be interpreted liberally in favor of consumers, undercuts WZP's suggested interpretation.

The FDCPA is a broad, remedial statue, *see Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1060 (9th Cir. 2011), that must be interpreted liberally to achieve its stated purposes. *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1019, 1025 (9th Cir. 2012). But WZP's reading of Subsection 1692g(a) adopts an

---

[17]    *Available at* http://www.ftc.gov/sites/default/files/documents/public_statements/ life-debt-data-integrity-debt-collection/130606debtcollectionroundtable.pdf

exceedingly narrow interpretation that defeats the purpose of the provision itself. *See supra*, Argument, Section II. This Court should therefore reject it.

### IV. The Circuit Courts of Appeals that issued *Lee v. Cohen, McNeile & Pappas, P.C.*, and *Oppong v. First Union Mortgage Corp.* specifically noted that the decisions are unpublished, not binding, and lack precedential value.

WZP states that "two other Circuit Courts of Appeal that have considered this issue, both of which agreed that there is only one initial communication, and that subsequent debt collectors are not required to send a Validation Notice." DktEntry 30 at 25. But not only is WZP's characterization of these two decisions overly ambitious—and in the case of *Lee v. Cohen, McNeile & Pappas, P.C.*, somewhat misleading—both the Sixth and Tenth Circuits noted on the face of their respective decisions that they are unpublished, not binding, and lack precedential value.

In particular, in *Lee v. Cohen, McNeile & Pappas, P.C.*, the Tenth Circuit took particular care to note: "This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel." *See id*. at 650 n.1.

Likewise, in *Oppong v. First Union Mortgage Corp.*, the Tenth Circuit made clear that its opinion was "not for publication," and governed by Third Circuit IOP 5.7, which provides: "The court by tradition does not cite to its not precedential

opinions as authority. Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing."

### V. WZP's citation to district court opinions that ignore not only the natural reading of Subsection 1692g(a), but also the purpose for which Congress drafted the provision, carry little weight.

WZP cites a number of district court decisions that support its suggested interpretation. *See* DktEntry 30 at 25-28. Ms. Hernandez cites a number of other opinions that support her interpretation, *see* DktEntry 10-1 at 19-21—an interpretation with which the FTC an CFPB agree. *See generally* DktEntry 14.

But that a number of district courts have agreed with WZP's suggested interpretation cannot change that it is contrary to the natural reading of Subsection 1692g(a), and that it undermines the very purpose for which Congress enacted the provision.

### Conclusion

WZP's suggested interpretation is contrary to the natural reading of Subsection 1692g(a), it undermines the very purpose for which Congress enacted the provision, and it ignores the FDCPA's broad, remedial nature. This Court should therefore reject WZP's reading of Subsection 1692g(a).

/s/ Aaron D. Radbil
Aaron D. Radbil
GREENWALD DAVIDSON RADBIL PLLC
5550 Glades Road, Suite 500
Boca Raton, Florida 33431
(561) 826-5477

17

## Certificate of Compliance

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1 because:

    [ X ] this brief contains [3,817] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2000*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: January 8, 2015          /s/ Aaron D. Radbil
                                *Counsel for Appellant*

## Certificate of Filing and Service

I hereby certify that on this 8th day of January, 2015, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Timothy J. Thomason
Nicole F. Bergstrom
DICKINSON WRIGHT/MARISCAL WEEKS
2901 North Central Avenue
Phoenix, AZ 85012

*Counsel for Appellee*

/s/ Aaron D. Radbil
*Counsel for Appellant*