**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARIA HERNANDEZ, on behalf of herself and all others similarly situated, *Plaintiff-Appellant*, | No. 14-15672 |
| | D.C. No. 2:12-cv-00731-SMM |
| v. | |
| WILLIAMS, ZINMAN & PARHAM PC, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted March 17, 2016
San Francisco, California

Filed July 20, 2016

Before: John T. Noonan, Ronald M. Gould,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland

# SUMMARY*

### Fair Debt Collection Practices Act

The panel reversed the district court's summary judgment in favor of the defendant in an action under the Fair Debt Collection Practices Act.

The Act requires that within five days of "the initial communication" with a consumer about the collection of a debt, a debt collector must send the consumer a notice containing specific disclosures. The panel held that this requirement, set forth in 15 U.S.C. § 1692g(a), does not apply only to the initial debt collector that tries to collect, but also applies to subsequent collectors that communicate about the same debt.

# COUNSEL

Aaron D. Radbil (argued), Greenwald Davidson PLLC, Boca Raton, Florida, for Plaintiff-Appellant.

Victoria Orze (argued), Anne L. Tiffen, and Charles H. Oldham, Dickinson Wright PLLC, Phoenix, Arizona, for Defendant-Appellee.

Kristin Bateman (argued), Attorney; Nandan M. Joshi, Senior Litigation Counsel; To-Quyen Truong, Deputy

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

General Counsel; Meredith Fuchs, General Counsel; Consumer Financial Protection Bureau, Washington, D.C.; for Amicus Curiae Consumer Financial Protection Bureau.

Burke W. Kappler, Colin Hector, and Thomas E. Kane, Attorneys; David C. Shonka, Principal Deputy General Counsel; Jonathan E. Nuechterlein, General Counsel; Federal Trade Commission, Washington, D.C.; for Amicus Curiae Federal Trade Commission.

## OPINION

FRIEDLAND, Circuit Judge:

The Fair Debt Collection Practices Act ("FDCPA") requires that within five days of "the initial communication" with a consumer about the collection of a debt, a debt collector must send the consumer a notice containing specified disclosures. 15 U.S.C. § 1692g(a). The question presented here is whether the phrase "the initial communication" as used in the FDCPA means the first communication from the initial debt collector that tries to collect, or whether it means the first communication a consumer receives from any collector about a debt, including subsequent collectors that communicate about the same debt.

Applying well-established tools of statutory interpretation and construing the language in § 1692g(a) in light of the context and purpose of the FDCPA, we hold that the phrase "the initial communication" refers to the first communication sent by any debt collector, including collectors that contact the debtor after another collector already did. In other words, if there are multiple debt collectors that try to collect a debt, each one must send the

required notice after its first communication with the alleged debtor about the debt. Because the district court held otherwise, we reverse and remand for further proceedings.

## I.

This case began with a loan that Maria Hernandez took out to finance an automobile purchase. After Hernandez stopped making payments on the loan, Thunderbird Collection Specialists, Inc. ("Thunderbird"), a debt collector, sent her a letter seeking to collect the debt. Hernandez did not respond to the letter.

Following Thunderbird's unsuccessful attempt to collect Hernandez's debt, Thunderbird retained the law firm Williams, Zinman & Parham PC ("WZP") as counsel to assist in its collection efforts. In December 2011, WZP sent Hernandez a collection letter, which was its initial communication with her. The letter notified Hernandez that WZP, a debt collector, represented Thunderbird regarding a debt incurred by Hernandez with the original creditor.[1]

---

[1] The parties agree that WZP qualifies as a debt collector under the FDCPA. In addition to identifying itself as a "debt collector" in its December letter, WZP conceded in its briefing and at oral argument that, when communicating with Hernandez, it was acting as a "debt collector" for purposes of the FDCPA. WZP's concession accords with the Supreme Court's recognition that the FDCPA "applies to attorneys who," like WZP, "'regularly' engage in consumer-debt-collection activity." *Heintz v. Jenkins*, 514 U.S. 291, 299 (1995). This is so even if the attorney is acting on behalf of a debt-collector client. *See Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1513 (9th Cir. 1994) (holding that "[a]ttorneys, like all other persons, are subject to the definition of 'debt collector' in 15 U.S.C. § 1692a(6)" and concluding that the defendant attorney acting on behalf of a client debt collector was subject

While it informed Hernandez that she could dispute the debt or request additional information about the original creditor, it did not tell her that she could do so only in writing.

Hernandez filed the instant lawsuit against WZP in the United States District Court for the District of Arizona as a putative class action, alleging that WZP violated the FDCPA by sending a debt collection letter that lacked the disclosures required under § 1692g(a) of the FDCPA. That section provides in full:

> (a) Notice of debt; contents
>
> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—
>
> (1) the amount of the debt;
>
> (2) the name of the creditor to whom the debt is owed;
>
> (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or

---

to the FDCPA's requirements). WZP has not argued either before the district court or on appeal that it was exempt from § 1692g(a)'s requirements because it was acting as an agent for Thunderbird, so we need not address that question.

> any portion thereof, the debt will be assumed to be valid by the debt collector;
>
> (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
>
> (5) a statement that, upon the consumer's written request within the thirty day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a).[2] We refer herein to the written notice containing these disclosures as a "validation notice."

Hernandez alleged that WZP's failure to notify her that any dispute about the debt had to be in writing to obtain verification of it, or that any request had to be in writing to

---

[2] Pursuant to § 1692g(b), if a consumer exercises her rights by disputing the debt in writing or sending a written request under §§ 1692g(a)(4) or (5), the debt collector must "cease collection of the debt" until it "obtains verification of the debt . . . or the name and address of the original creditor" and mails this information to the consumer. 15 U.S.C. § 1692g(b).

obtain the name and address of the original creditor, violated §§ 1692g(a)(4) and (a)(5), respectively.

The parties filed cross-motions for summary judgment on Hernandez's FDCPA claims.  In its motion, WZP did not address whether its letter lacked the content required by § 1692g(a).  Rather, it contended that it was not required to comply with that provision because Thunderbird's March letter was the "initial communication" sent to Hernandez with respect to the debt at issue and therefore the sole communication triggering § 1692g(a)'s requirements.  The district court agreed and granted summary judgment in favor of WZP.

Hernandez timely appealed, contending that § 1692g(a) imposes the requirement to send a validation notice on each and every debt collector that communicates with a consumer about a given debt.[3]

---

[3] Hernandez is joined in this interpretation by the Consumer Financial Protection Bureau, which has delegated rulemaking authority under the FDCPA, and the Federal Trade Commission, which shares concurrent authority to enforce the FDCPA with the Bureau.  *See* 15 U.S.C. § 1692*l* (setting forth administrative enforcement and rulemaking authority under the FDCPA); *see also* 12 U.S.C. §§ 5491(a), 5512(b)(1) (establishing the Bureau to regulate the provision of consumer financial products and services and delegating authority to the Bureau to promulgate rules as necessary to administer consumer financial laws).  In their brief as amici curiae, these agencies argue that § 1692g(a) should be interpreted to apply to WZP's initial communication to Hernandez, and they urge us to defer to their interpretation should we find the statutory text to be ambiguous.

## II.

We review de novo the district court's interpretation of § 1692g(a), as well as its rulings on cross-motions for summary judgment based on that interpretation. *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1168 (9th Cir. 2006).

## III.

The sole dispute on appeal is whether the phrase "the initial communication" as used in § 1692g(a) refers only to the very first communication sent about a debt or instead to the first communication sent by each and every debt collector that seeks to collect it, including those collectors that take over collection efforts from a prior debt collector. Although this question has divided the district courts, it is an issue of first impression for this court, and it has not yet been addressed in a published opinion by any of our sister circuits.[4]

In answer to this question, we hold that although the sentence in § 1692g(a) in which the phrase "the initial communication" appears is ambiguous when read in isolation, when the sentence is read in the context of the FDCPA as a whole and in light of the statute's remedial

---

[4] Two of our sister circuits declined to apply § 1692g's requirements to a subsequent debt collector, but they did so in unpublished decisions without explaining the basis for their construction of the statute. *See Lee v. Cohen, McNeile & Pappas, P.C.*, 520 F. App'x 649 (10th Cir. 2013) (unpublished); *Oppong v. First Union Mortg. Corp.*, 326 F. App'x 663 (3d Cir. 2009) (per curiam) (unpublished).

purpose, it is clear that the validation notice requirement applies to each debt collector that attempts to collect a debt.

### A.

In ascertaining the meaning of § 1692g(a), we begin, as always, with the statutory text. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Because we must "presume that [the] legislature says in a statute what it means and means in a statute what it says there," *id.* (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)), if we find that the statutory meaning is plain and unambiguous, then our "sole function . . . is to enforce it according to its terms," *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

In deciphering the meaning of a statute, we "do not look at its words in isolation." *Int'l Ass'n of Machinists, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Grp.*, 387 F.3d 1046, 1051 (9th Cir. 2004). Rather, we determine "[t]he plainness or ambiguity of statutory [text] . . . by reference to the [text] itself, the specific context in which that [text] is used, and the broader context of the statute as a whole." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1133 (9th Cir. 2009) (all but first alteration and ellipses in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). To that end, we "pursue consistency not only within a particular provision but also among the provisions of the FDCPA," *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1175 (9th Cir. 2006), in order to produce an understanding of "the statute 'as a symmetrical and coherent regulatory scheme' and to 'fit, if possible, all parts into a harmonious whole,'" *Am. Bankers Ass'n v. Gould*, 412 F.3d 1081, 1086 (9th Cir. 2005) (alteration omitted) (quoting

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

If the operative text is ambiguous when read alongside related statutory provisions, we "must turn to the broader structure of the Act," *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015), and to its "object and policy[] to ascertain the intent of Congress," *United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, Cal.*, 545 F.3d 1134, 1141 (9th Cir. 2008) (quoting *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999)); *see also Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."). "The words of a statute are, of course, dead weights unless animated by the purpose of the statute." *Favish v. Office of Indep. Counsel*, 217 F.3d 1168, 1171 (9th Cir. 2000).

When an examination of "the plain language of the statute, its structure, and purpose" clearly reveals congressional intent, "our 'judicial inquiry is complete.'" *Real Prop.*, 545 F.3d at 1143 (quoting *Campbell v. Allied Van Lines, Inc.*, 410 F.3d 618, 622 (9th Cir. 2005)). But if the plain meaning of the statutory text remains unclear after consulting internal indicia of congressional intent, we may then turn to extrinsic indicators, such as legislative history, to help resolve the ambiguity. *BF Goodrich*, 387 F.3d at 1051–52 (explaining that only if holistic analysis of the statutory text "leaves ambiguity—or, indeed, if it reveals it—may we turn to extrinsic indicia of legislative intent."); *see also Benko v. Quality Loan Serv. Corp.*, 789 F.3d 1111, 1118 (9th Cir. 2015) ("If the statutory text is ambiguous, we

employ other tools, such as legislative history, to construe the meaning of ambiguous terms.").

### B.

The text of § 1692g(a) does not alone reveal which party's interpretation is correct.  In the FDCPA, Congress did not define the term "the initial communication" or the word "initial."  Congress did define "communication" to mean "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2).  This definition of "communication" is broad enough to sweep into its ambit both the March letter from Thunderbird and the December letter from WZP.

WZP argues that, regardless of the lack of formal definition in the FDCPA, the meaning of § 1692g(a)'s phrase "the initial communication" is clear.  WZP contends that by using the definite article "the" preceding "initial communication," Congress plainly contemplated that only *one initial* communication with a debtor about a given debt would trigger the validation notice requirement.  According to WZP, under this definition, it was not obligated to send a validation notice because, as the second collector to attempt to collect the debt, it did not send Hernandez the very first (i.e., "*the* initial") communication about the debt.

When the phrase "the initial communication" is viewed in isolation, WZP is correct that the use of "[t]he definite article 'the' instead of the indefinite 'a' or 'an'" preceding initial communication appears to "indicate[] that Congress meant for a single" communication to trigger the validation notice requirement.  *Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231, 1234 (9th Cir. 2002); *see also United States v. Barron*, 172 F.3d 1153, 1163 (9th Cir. 1999) (en banc) ("Congress'[s] use of the definite article 'the,' when

referring to 'the judgment,' carries the message that there is one identifiable document."). This is because the definite article "the" "particularizes the subject spoken of," suggesting that Congress meant to refer to a single object (here, a single initial communication). Black's Law Dictionary 1647 (4th ed. 1968) (providing as an example that "'[t]he' house means only one house").

The meaning of the phrase "the initial communication" is less clear, however, when the phrase "the initial communication" is read in conjunction with the phrase "a debt collector" that follows in the same sentence. *Gale v. First Franklin Loan Servs.*, 701 F.3d 1240, 1244 (9th Cir. 2012) (refusing to take a "blindered view of" a statute by construing its language "in isolation"); *see also Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) ("Statutory language 'cannot be construed in a vacuum.'" (quoting *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012))). Congress provided that within five days of "*the* initial communication, . . . *a* debt collector" must send a validation notice. 15 U.S.C. § 1692g(a) (emphases added). In contrast with its particularization of "initial communication," Congress's use of the indefinite article "a" preceding "debt collector" gives that term "generalizing force," *Gale*, 701 F.3d at 1246 (quoting *In re Cardelluci*, 285 F.3d at 1234), and thus suggests that Congress may have intended to impose the validation notice requirement on *any* debt collector subject to FDCPA requirements. *See* Black's Law Dictionary 3 (4th ed. 1968) (providing that "[t]he article 'a' . . . is often used in the sense of 'any'"); *see also Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1171 (9th Cir. 2011) (explaining that by using "the indefinite article 'a'" in the phrase "a mark or trade name in commerce that is likely to cause dilution," Congress "indicate[d] that *any* number of unspecified, junior marks may be likely to dilute

the senior mark" (emphasis added) (quoting 15 U.S.C. § 1225(c)).

Ultimately, nothing in § 1692g(a) limits its application to only the first debt collector that communicates about a debt. At the same time, nothing in the section clarifies whether "the initial communication" refers to the first communication ever sent about the debt or the first communication sent by each and every debt collector seeking to collect it. As WZP argues, Congress's use of the phrase "a debt collector" could mean that whichever debt collector sends the very first communication about a debt must comply with § 1692g. Or, as Hernandez argues, it could mean that each debt collector must comply with § 1692g upon sending *its* first communication about the debt. Either interpretation is consistent with the language of § 1692g(a), and the section is therefore ambiguous when viewed apart from its statutory context.[5]  *See Ileto*, 565 F.3d at 1134 (looking to statutory context to clarify ambiguity because the term in question, viewed in isolation, "ha[d] a spectrum of meanings").

## C.

Because the text of § 1692g(a) is ambiguous when read alone, "we must turn to the broader structure of the [FDCPA]" to determine which initial communication

---

[5] The operative dictionary definition of "initial" does not clarify this ambiguity. The word "initial" simply means "[t]hat which begins or stands at the beginning." Black's Law Dictionary 923 (4th ed. 1968). In this context, it could demarcate either the first communication ever sent (i.e., the beginning of collection efforts on a given debt) or the first communication sent by each and every debt collector (i.e., the beginning of each individual debt collector's efforts).

triggers the validation notice requirement—the first ever sent or the first sent by any debt collector, whether first or subsequent. *King*, 135 S. Ct. at 2492. "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Id.* (alteration in original) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)). Viewing the text of § 1692g(a) in the context of the FDCPA as a whole makes clear that the validation notice requirement applies to each debt collector that tries to collect a given debt. This interpretation is the only one that is consistent with the rest of the statutory text and that avoids creating substantial loopholes around both § 1692g(a)'s validation notice requirement and § 1692g(b)'s debt verification requirement—loopholes that otherwise would undermine the very protections the statute provides. *See King*, 135 S. Ct. at 2492–93 (rejecting an interpretation that would create the problem Congress designed the statute to avoid).

Examining the full text of the FDCPA reveals that Congress used the phrase "a debt collector" throughout the statute to impose obligations and restrictions on all debt collectors throughout the entire debt collection process. For instance, the FDCPA:

- regulates the time and place at which "a debt collector" may communicate with a consumer, 15 U.S.C. § 1692c(a);

- bars "a debt collector" from communicating with third-parties about a debt, 15 U.S.C. § 1692c(b);

- proscribes harassment and abuse by "A debt collector," 15 U.S.C. § 1692d;

- bars "A debt collector" from using "false, deceptive, or misleading representation[s]" in connection with the collection of any debt, 15 U.S.C. § 1692e; and

- prevents "A debt collector" from using "unfair or unconscionable means" to collect a debt, 15 U.S.C. § 1692f.

None of these provisions contains any language suggesting that Congress intended to exempt successive debt collectors from their requirements. And the FDCPA's broad definition of "debt collector" plainly encompasses those persons who take over debt collection efforts from another. *See* 15 U.S.C. § 1692a(6) (defining "debt collector" to include, with specified exceptions, "*any person* . . . who regularly collects or attempts to collect, directly or indirectly, debts owed . . . or due another" (emphasis added)).

Had Congress intended to distinguish between the obligations that attach to initial and subsequent debt collectors, "it would have said so explicitly." *Trs. for Alaska v. U.S. Dep't of Interior*, 919 F.2d 119, 122 (9th Cir. 1990). Instead, Congress made clear the broad reach of these obligations by imposing civil liability on "*any debt collector* who fails to comply with any provision" of the FDCPA. 15 U.S.C. § 1692k(a) (emphasis added).

WZP attempts to show that Congress intended to cabin § 1692g(a)'s requirements to the initial communication sent by the initial debt collector, but those attempts are unavailing. First, WZP argues that Congress's use of the definite article in the phrase "the thirty-day period" in

subsections (a)(4) and (a)(5) of § 1692g demonstrates "that the statute contemplated *one* 'initial communication' and *one* thirty-day period for dispute."   WZP's argument is unpersuasive because the phrase "the thirty-date period" must be looked at in relation to subsection (a)(3).   In subsection (a)(3), Congress provided that the validation notice must contain "a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, . . . the debt will be assumed to be valid by the debt collector."   15 U.S.C. § 1692g(a)(3).  The term "the thirty-day period" logically refers back to the term "thirty days after receipt of the notice" in subsection (a)(3), while "the notice" refers back to the validation notice that must be sent by "a debt collector" following "the initial communication."  *See Gale*, 701 F.3d at 1246 (looking at the preceding sentence to determine what was meant by "[t]he use of the definite article" in a statutory provision); *see also* Oxford English Dictionary 258 (1st ed. 1884) (providing that the word "the" "[m]ark[s] an object as before mentioned or already known, or contextually particularized (e.g. 'We keep a dog.  We are all fond of *the* dog.')"); Webster's New Int'l Dictionary of the English Language Unabridged 2368 (3d ed. 1976) (defining "the" as "a function word to indicate that a following noun . . . refers to someone or something previously mentioned or clearly understood from the context of the situation <if anyone pays you a dollar for that picture, take [the] dollar>").  Thus, Congress's use of the definite article in the term "the thirty-day period" serves as an internal reference to other statutory subsections, not as an indicator of the total number of dispute periods that Congress intended to provide debtors.  Congress's use of the term "the thirty-day period" therefore does not shed light on whether there can be only one notice and one period for dispute.

Next, WZP contends that Congress's distinction between "the initial written communication" and "subsequent communications" in § 1692e(11)—the only other FDCPA provision that uses a term similar to "the initial communication"—shows that Congress knew how to impose requirements on communications after the first one had that been its intent.  Section 1692e(11) prohibits "[a] debt collector" from "fail[ing] to disclose in *the initial written communication* with the consumer . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and [from] fail[ing] to disclose in *subsequent communications* that the communication is from a debt collector."  15 U.S.C. § 1692e(11) (emphases added).    Contrary to WZP's contention, the fact that Congress chose to regulate both "initial" and "subsequent communications" in § 1692e(11) in no way suggests that it intended to limit the term "the initial communication" to the first communication ever sent about a debt.  Section 1692e(11) can readily be interpreted to regulate the initial and subsequent communications sent by each and every debt collector that communicates about a debt.   Indeed, the language of § 1692e(11) supports that interpretation because the fact that it plainly differentiates between "initial" and "subsequent" communications suggests Congress knew how to distinguish between initial and subsequent debt collectors had that been its intent.  *See United States v. Rojas-Contreras*, 474 U.S. 231, 235 (1985) (discerning from statutory language that Congress "knew how to provide for the computation of time periods under the [Speedy Trial] Act relative to the date of an indictment" and that it would have so provided in the statutory section in question had that been its intent).  That Congress chose not to is consistent with the FDCPA's broad imposition of requirements on all debt collectors throughout the lifecycle of a debt.

WZP's restrictive interpretation that there is only a single "initial communication" about a debt also creates a significant structural problem in the Act.  As several district courts have pointed out, restricting the validation notice requirement to the initial debt collector produces a loophole that would, in practice, undermine consumers' efforts to verify their debts and Congress's mandate that collection efforts halt until verification occurs.  *See, e.g.*, *Janetos v. Fulton Friedman & Gullace, LLP*, No. 12-C-1473, 2013 WL 791325, at *5 (N.D. Ill. Mar. 4, 2013); *Stair ex rel. Smith v. Thomas & Cook*, 254 F.R.D. 191, 197 (D. N.J. 2008); *Turner v. Shenandoah Legal Grp.*, No. 3:06-CV-045, 2006 WL 1685698, at *11 (E.D. Va. June 12, 2006).  "Congress'[s] intent in enacting § 1692g was to provide an alleged debtor with 30 days to question and respond to the initial communication of a collection agency."  *Camacho v. Bridgeport Fin. Inc.*, 430 F.3d 1078, 1082 (9th Cir. 2005). Once a consumer disputes the validity of an alleged debt or requests information about the original creditor in writing in response to a debt collector's validation notice, the debt collector must "cease collection of the debt" until verification has been provided.  15 U.S.C. § 1692g(b).  But nothing in the statute prevents the debt collector from passing the debt on to a subsequent debt collector in lieu of responding to the verification demand.  This is so because § 1692g(b) gives a debt collector a choice upon receiving a request for validation: "the collector 'may provide the requested validations and continue [its] debt collection activities, or it may cease all collection activities.'" *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 940 (9th Cir. 2007) (per curiam) (alteration omitted) (quoting *Jang v. A.M. Miller & Assocs.*, 122 F.3d 480, 483 (7th Cir. 1997)). If a debt collector determined that collecting on a debt was "not worth the effort," the collector would be at liberty to "sell the account."  *Id.*  And if the collector did sell the debt,

the debt collector that purchased it, on WZP's reading, would be permitted to collect free from § 1692g's strictures, and the consumer would be effectively unable to obtain the information necessary to verify or dispute her debt. Such a loophole would render § 1692g almost a nullity, and we therefore decline to endorse WZP's interpretation. *See N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

WZP argues that this loophole could be closed by other provisions of the FDCPA. That argument is not persuasive. Although WZP cites a range of FDCPA provisions, it fails to explain how any of them would allow a consumer to verify and effectively dispute a passed-on debt. Congress must have believed that those other provisions were not sufficient; otherwise, it would not have separately enacted the validation notice and debt verification requirements. Indeed, the implication of WZP's argument is that § 1692g is superfluous. We decline to interpret the Act in a way that renders one of its central consumer-protective provisions inoperative. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))).

WZP also predicts that the loophole would be closed by judicial interpretation. It contends that courts faced with the loophole would likely hold that any subsequent debt collector found to be in privity with a previous collector must itself halt collection efforts until verifying the debt. That argument is flawed in several respects. First, it presumes the existence of a privity relationship between the collectors.

Even if WZP is correct that a subsequent debt collector must respect any dispute received by a previous one with which it is in privity, this proposition provides no assistance when a privity relationship between the initial and subsequent collectors does not exist.  Furthermore, WZP points to no interpretation of any provision in the Act that would require courts to hold that subsequent collectors must respect disputes received by prior ones.  We know of no statutory interpretation principle that would allow us to interpret a statute in a manner that creates a nonsensical loophole just because courts might be able to apply a common law principle to close the loophole in a subset of cases.  Rather than resorting to speculative stopgaps, we adopt the interpretation that itself maintains the Act's intrinsic structural integrity.[6]

---

[6] WZP's interpretation that only the very first communication about a given debt triggers the validation notice requirement causes additional problems if that first communication comes from the original creditor rather than a debt collector.  A creditor's letter to a debtor appears to fall within the FDCPA's broad definition of a "communication."  15 U.S.C. § 1692a(2) (defining "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium").  Because "a 'creditor' is not a 'debt collector' under the FDCPA," *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1031 (9th Cir. 2009) (citing 15 U.S.C. § 1692a(6)(A)), however, the creditor is not required to send a validation notice following that initial communication. As a consequence, it is possible that under WZP's interpretation, no one would be required to send the consumer a validation notice if the original creditor were the first entity to communicate about the debt, because the sole "initial communication" triggering the validation notice requirement would have been sent by an entity exempt from the Act's requirements.  Our interpretation of the statute avoids this problem because each debt collector would be required to send a validation notice with its own first communication about the debt irrespective of whether the original creditor previously communicated about the debt.

### D.

Interpreting "the initial communication" to refer to the first communication by any debt collector is also more in keeping with the FDCPA's declared purpose of protecting consumers from abusive debt collection practices. Congress enacted the FDCPA in 1977 against a backdrop of "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). As the Act itself states, Congress's goal was "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). As a "broad remedial statute," *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1060 (9th Cir. 2011), the FDCPA must be liberally construed in favor of the consumer in order to effectuate this goal of eliminating abuse. *See Clark*, 460 F.3d at 1176; *accord Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002) ("Because the FDCPA . . . is a remedial statute, it should be construed liberally in favor of the consumer.").

Contrary to WZP's arguments, the remedial purpose of the FDCPA is furthered by giving consumers updated information about their debts and renewed opportunities to verify them as the debts change hands. Each time a debt is resold between collectors, information about the debt may be lost and misinformation introduced. *See* Fed. Trade Comm'n, *The Structure and Practices of the Debt Buying*

*Industry* 42 (2013)[7] ("[T]he information that collectors have about these debts may become less accurate over time, making it more likely that collectors will seek to recover from the wrong consumer, recover the wrong amount, or both."). Records of consumers' disputes are among the information that may be lost in transfer. *See* Gov't Accountability Office, *Credit Cards—Fair Debt Collection Practices Act Could Better Reflect the Evolving Debt Collection Marketplace and Use of Technology* 44 (2009)[8] (explaining that "important account information—such as results of disputed account investigations . . . —may not always be transferred to debt buyers"). As a consequence, the likelihood that a debt collector will seek to collect from the wrong consumer or in the wrong amount increases as the debt is resold. And the corresponding need for collectors to inform consumers of their validation rights and to respond to requests for verification becomes more acute as the debt changes hands. WZP is therefore incorrect when it argues that there is no salutary benefit to be gained by requiring each successive debt collector to send a new validation notice with its first communication.

Restricting the validation notice obligation to the first communication by the first debt collector would also restrict consumers' ability under § 1692g(b) to dispute the validity of their debts, obtain information to verify them, and protect themselves against the collection of invalid debts. This is because the rights provided under § 1692g(b) can only be

---

[7] *Available at* http://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf.

[8] *Available at* http://www.gao.gov/new.items/d09748.pdf.

exercised during the thirty-day period provided under § 1692g(a) and linked to "the initial communication" as used in that provision. *See* 15 U.S.C. § 1692g(b) (setting forth the consumer's rights upon notifying "the debt collector in writing within the thirty-day period described in subsection (a)"). WZP's interpretation would consequently restrict consumers to a single window of opportunity to halt collection efforts in order to verify their debts. That window would be of no assistance to a consumer who later suspects she is being improperly dunned by a misinformed successive collector.

We decline to read the Act in a way that is antithetical to Congress's express intent to protect consumers from abusive debt collection practices.

E.

Because Congress's intent to require each debt collector to send a validation notice with its initial communication is clear from the statutory text, we believe it is unnecessary to resort to external sources to interpret § 1692g(a). *See BF Goodrich*, 387 F.3d at 1051–52. But to the extent that any ambiguity remains, the external indicia of Congress's intent eliminate it.

The Senate Report's description of the validation notice provision suggests that Congress intended it to apply to each debt collector's first communication. The Report provides that "[a]fter initially contacting a consumer, a debt collector must sen[d] him or her written notice" with the required information. S. Rep. No. 95-382, 95th Cong. 1st Sess. 4 (1977). The Senate Report's use of the prepositional phrase "[a]fter initially contacting a consumer"—along with the use of "a" before "debt collector"—removes any doubt created by § 1692g(a)'s use of the definite article "the" to qualify

"initial communication" by making clear that a debt collector's validation notice obligation attaches after it "initially contact[s] a consumer." Construing "the initial communication" to exclude initial communications by subsequent debt collectors would conflict with this expression of legislative intent.

Consistent with the FDCPA's remedial nature, the legislative history also shows that Congress's sole goal in enacting § 1692g(a) was consumer protection. The Senate Report projected that § 1692g would "eliminate the recurring problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." S. Rep. No. 95-382 at 4. Calling it a "significant feature" of the FDCPA, *id.*, Congress "added the validation of debts provision specifically to ensure that debt collectors gave consumers adequate information concerning their legal rights," *Swanson v. S. Or. Credit Serv., Inc.*, 869 F.2d 1222, 1225 (9th Cir. 1989) (per curiam) (citing S. Rep. No. 95-382 at 4). Nothing in this legislative history suggests that Congress thought consumers needed less protection from successive debt collectors or less information as their debts passed from hand to hand.

Congress also gave no indication that anything in § 1692g was intended to minimize the burden that the validation notice requirement would impose on debt collectors. To the contrary, Congress appeared to believe that the validation requirement would impose no burden at all. The Senate Report stated that requiring debt validation would "not result in additional expense or paperwork" because "the current practice of most debt collectors is to send similar information to consumers." S. Rep. No. 95-382 at 4. Requiring all debt collectors (without differentiation as to their initial or successive status) to send the same required

information in their initial communications is consistent with these legislative expressions because it would provide continuing protection for consumers without disadvantaging an ethical collector.

WZP does not attempt to counter this legislative history, and we generally view an official committee report as a reliable indicator of congressional intent. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1082 (9th Cir. 1999) ("This circuit relies on official committee reports when considering legislative history."). Although the Senate Report does not expressly define the meaning of "the initial communication," its discussion of § 1692g's purpose extinguishes any doubt that Congress intended the validation notice provision to protect consumers throughout the entire lifecycle of a debt.[9]

## IV.

Having applied the tools of statutory construction, we hold that the FDCPA unambiguously requires any debt collector—first or subsequent—to send a § 1692g(a)

---

[9] Because application of the tools of statutory construction yields a clear answer to the question presented in this case, our inquiry is at an end without consideration of the interpretation advanced by the Consumer Financial Protection Bureau and the Federal Trade Commission. *See Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("If [by] employing traditional tools of statutory construction, [we are able to] ascertain[] that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."). Indeed, because the interpretation proffered by those agencies is the same interpretation that we arrive at in "interpreting the statute from scratch," "there is no occasion to defer and no point in asking what kind of deference, or how much" deference is owed. *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002).

validation notice within five days of its first communication with a consumer in connection with the collection of any debt. The district court thus erred in concluding that, because WZP was not the first debt collector to communicate with Hernandez about her debt, it had no obligation to comply with the statutory validation notice requirement.

**REVERSED and REMANDED.**